UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

GEORGE M. LENIART                    CASE NO. 3:11-CV-1635(SRU)
          PLAINTIFF

      -V-

WARDEN PETER MURPHY ET AL.,          JANUARY 3, 2013
          DEFENDANTS

## SECOND SUPPLEMENTAL COMPLAINT

### STATEMENT OF CASE

    This is a civil rights action filed by George M. Leniart,
a state prisoner, for money damages and injunctive relief under
42 U.S.C. §1983, alleging unreasonable search and seizures of
legal work product, unresonable interference with plaintiff's
ability to consult counsel, interference with attorney client
communications and work product, reading and disseminating
attorney / client confidential correspondence, invasion of legal
privacy, and several counts of retaliation for asserting and
defending plaintiff's civil rights.

### JURISDICTION

1. The court has jurisdiction over the plaintiff's claims of
violation of Federal Constitutional Rights under 28 U.S.C
§§ 1331 and 1343.

### PARTIES

2. The plaintiff George M. Leniart #250010, was a pretrial
detainee at Walker CI. high bond unit [M.W.C.I.] during
counts 1 through 3, and a sentenced prisoner counts 4 through

5 , and is currently housed at Cheshire CI. [C.C.I.] 900 Highland Ave, Cheshire CT. 06410.

3. The defendant Peter Murphy, is / was the warden at M.W.C.I. during the events described within this complaint, and was responsible for reviewing the administrative remedies, also, in charge of supervision and disipline of correctional staff at M.W.C.I. he actively participated in investigations and was informed of the alleged constitutional violations., he also, was in charge of making decisions to preserve the NICE vision security video. He is sued in his individual and official capacities.

4. The defendants' John Patz, Capt. Salius, and Ronald Black, were correctional supervisors during the events described within this complaint. They are sued in their individual capacity.

5. Defendant Karen Martucci, was / is a correctional counselor supervisor and unit manager at M.W.C.I. during the events described within this complaint. She is sued in her individual capacity.

6. Defendant's Allen M. Coachman, John Fleming, Auntonio Villarini, are correctional officers at M.W.C.I. during the events described in this complaint. They are sued in their individual capacity.

7. Defendant's Thomas C. Morrarty,and C.J. Yother are correctional officer's at Corrigan CI. 986 Norwich NL. TPKE., Uncasville CT. 06382, during all events described herein. They are sued in their individual capacity.

8. Defendant Bowen , was a correctional transportation officer [CTU] from the North District, now based in Enfield CT. During the events described within this complaint, he is sued in his individual capacity.

9. Defendant J. Lawrie, is and was at all times relevant to this complaint a correctional counselor supervisor and the H1-unit manager at MWCI during all the events described within this complaint. He is sued in his individual capacity.

10. Defendant Sarah Skribiski, was at all times relevant to this complaint a correctional counselor in the H1-unit at MWCI during all the events described within this complaint, she is sued in her individual capacity.

11. All defendant's acted and continue to act under the color of law at all times relevant to this complaint.

<u>FACTS</u>

C O U N T   O N E

12. On October 20, 2008, at 3am. plaintiff was awakened and ordered to proceed to the admitting and property room [A/P room] for a scheduled court trip for criminal charges he was facing.

13. Plaintiff was ordered to place his legal folder on a steel table by C/O Villarini, plaintiff's legal folder was clearly marked legal / confidential, plaintiff objected, and was given a direct order by another officer, plaintiff conceded.

14. After being fed and strip searched plaintiff was moved to another holding cell to await CTU transport to be transported to the Corrigan CI. hub.

15. After all inmate's were locked in their designated holding cells to await CTU, plaintiff observed C/O Villarini start looking through plaintiff's legal folders.

16. Plaintiff's folder contained several manila envelopes marked legal / confidential plaintiff's attorney had asked plaintiff to be prepared to go over critical materials in his case that day in court.

17. All plaintiff's attorney / client pre-trial confrences were were held at the New London courthouse lockup, never at the correctional facility.

18. Plaintiff's several manila envelopes contained critical documents essential to his defense, including but not limmited to, letters his attorney wrote and plaintiff's responses, hand written documents that plaintiff posed to his attorney regarding crucial evidence in question, newspaper clippings of case related materials, and information regarding correctional officer's working in collusion with jail informants, state police reports and potential defense strategy.

19. Defendant's spent over 30 minutes reading documents, making comments and joking around about plaintiff's case, then removing newspaper and hand written documents.

20. Defendant's believed all inmate's were out of view of the table, however, plaintiff was able to see through a reflection in the glass of a opposite holding cell window.

21. Plaintiff banged repeatedly on the cell window and attempted

to call the defendant's asking why are you reading my legal papers, Villarini came to the cell window and said "we can do what ever we want" then walked away.

22. Plaintiff was aware the D.O.C. monitors and records all activity in the A/P room with NICEVISION video recording and the table that defendant's were at is in clear view of a camera.

23. Plaintiff watched as Villarini and another officer then brought all the legal folders to the officers station infront of the sallyport door where it would then be in view of all inmate's until CTU pick up.

24. When CTU arrived, chained, and shackled plaintiff , plaintiff requested that he be able to check his folders and examine their contents, plaintiff was told by the A/P officers that he can get his folders when he gets to the Corrigan CI. hub.

25. Defendants began making derogatory and degrading coments to the plaintiff regarding issues that they could have only known by reading his legal paperwork, they then stated "we can read anything we want especially handwritten materials.

26. Immediately after receiving his legal folder at Corrigan CI. plaintiff noticed numerous documents were missing, he then immediately brought this to the attention of Corrigan staff, who informed plaintiff that it was a Walker CI. issue.

27. Plaintiff then brought this incident to the attention of his attorney and was unable to proceed with critical lines of discussion because he could not recall his intentions without

his documents and notes that he had prepared over the last month about jailhouse informants being in collusion with D.O.C. staff.

28. Plaintiffs capitol felony case totally relied on information brought forth by jailhouse informants however, these documents did not have the name of any inmates at this time.

29. Immediately upon plaintiff's return to the Walker facility the next morning plaintiff informed his unit manager Capt. John Patz, who told plaintiff that "they can do that" plaintiff disagreed and asked for a remedy form and was told he could write to the C.T.O. for that, plaintiffs requests were never answered.

30. These claims are not unique, plaintiff became aware that this was broad sweeping informal policy and daily procedure at Walker CI. and implemented amongst the high bond population by correctional intelligence in collusion with law enforcement efforts to gain strategy information to prosecute weak cases.

C O U N T   T W O

31. November 17, 2008, plaintiff was brought on another 3am. court trip which mirrored the last on 10-20-08.

32. When locked in the holding cell to await CTU pickup plaintiff cautiously watched his legal paperwork as defendant Villarini, and the other officer's began searching though his legal folder taking out the contents of each manila envelope.

33. On this court date plaintiff had prepared a 26 page handwritten time line which contained crucial information of facts explaining in detail a twelve year occurrence of events critical

to plaintiff's capitol felony arrest, and a six page outline
of a posed defense strategy to be able to inform his attorney
which direction he wanted to go in.

34. Correctional officer's began to read the documents then
handed it to Villarini, who read it and then walked around the
corner to a office.

35. Plaintiff began kicking the holding cell door which rattled
the whole holding area, when plaintiff looked again, he seen
flashes from the photocopier.

36. Plaintiff began yelling to the defendant who ignored all
the plaintiff's actions, he continued for five minutes.

37. LT. Black entered the A/P room from a door on the opposite
side of the A/P room and came in front of the holding cell door
giving plaintiff a direct order to stop kicking the door.

38. Plaintiff explained that Villarini was reviewing , reading
and copying his legal papers, Black left to talk to defendants.

39. After joking around a bit, Black returned and told plaintiff
"nobody is reading your legal papers".

40. Plaintiff explained how he could see through the reflection
in the other holding cell door, plaintiff told Black to review
the video if he did not believe him.

41. LT. Black, stated "what are you saying, that my officer's
are lying to me" plaintiff again said to review the video, Black
left as plaintiff said he wanted his legal papers brought out
front and that he wanted the copies that were made.

42. LT. Black came back a third time and told plaintiff that his officers can read any handwritten material and they did not copy anything.

43. Plaintiff explained the importance of the documents and that they were confidential and that each document had attorney-client privileged written on them, and that plaintiff would be letting his attorney know about this incident.

44. When C.T.U. driver arrived, chained, and shackled plaintiff while on the way out plaintiff asked the LT. for permission to check his legal papers, plaintiff was told he will get them when he gets to Corrigan.

45. When plaintiffs legal folders were returned to him at Corrigan CI. he immediately noticed missing documents again, specifically hand written documents that plaintiff had rewritten because they were confiscated on the last court trip by the defendants at Walker CI.

46. The missing documents gave specific details regarding correctional officers and how plaintiff alleged he was being set up.

47. When plaintiff brought this to the attention of his attorney, he informed plaintiff was told to file a complaint when he got back to the jail.

48. Upon return to M.W.C.I. compound plaintiff was the last inmate to be dropped off, and was alone with the C.T.U. driver when he momentarily stopped the van between MacDougal building and Walker Buildings.

8

49. The CTU driver Bowen , stated to the plaintiff "we are all around you, that was a nice little story you wrote for your lawyer" further stating that he gave a copy to a family member that was a detective at Troop E who was investigating plaintiff's case and if there was any more "tapes", that he wanted to trade for his paperwork, "because we are going to do what we have to do to keep you in here".

50. It was at that time plaintiff realized that Bowen , was referring to plaintiff's paperwork that was copied earlier that morning.

51. Upon returning to the facility, the very next morning the plaintiff went to the captains office and informed Capt. John Patz, what happened, Patz typed an Email to the third shift supervisor.

52. Plaintiff also informed Capt. Patz, that he wanted the video preserved from the A/P room, plaintiff was told he had to write to the Warden, which he did, plaintiff also filed a remedy form.

53. On 12-24-08, plaintiff received a response from Warden Murphy stating that plaintiff's claims have no merit.

54. Plaintiff immediately filed a writ of habeas corpus on 12-26-08, regarding all the issues that occurred on 10-20-08, and 11-17-08.

55. At the habeas pretrial hearing Judge Levine, ordered the D.O.C. to allow plaintiff to review the NICEVISION security video of the A/P room.

56. The month of December 2009, plaintiff received a letter from the Attorney Generals office claiming that the video tapes were not preserved since there was no request for them within 30 days.

57. Plaintiff had reported the incident to Captain Patz, on 10-20-08 and again on 11-10-08, and each time requested that the video be preserved.

58. Plaintiff wrote requests to Warden Murphy on 11-20-08, and 12-5-08, and filed a administrative remedy on 12-10-08, informing him about the incident. and requesting that thevideo be preserved

59. On 7-17-09, plaintiffs legal documents that he was bringing to court were again taken , during this court date plaintiff demanded that his attorney bring all these incidents to the courts attention , plaintiffs attorney also informed the state Attorney Generals Office of the on-going issues regarding the reading and confiscation of plaintiffs legal paperwork.

60. On 1-5-09, plaintiffs §1983 civil suit NO. 3:09-cv-00009 was filed with the Federal court, regarding claims against several state police officers and Department of Corrections parole agents for issues non-related to the specifics of this action.

61. While making photocopies of the 1983 complaint Capt. John Patz and C/S Martucci, became aware of the complaint because plaintiff had to put his complaint in possession of the C.T.O. to be photo copied, which is policy at Walker CI.

COUNT   THREE

62. On 1-4-10, plaintiff was in Walker CI. A/P room awaiting

10

CTU transport for trial. Plaintiff had 4, four inch folders, while being checked for contraband  the correctional officer's began reading all hand written notes plaintiff had prepared for cross-examination of jailhouse informants and various defense strategy, also letters that plaintiff's counsel had sent to him.

63. Plaintiff objected, but could only stand by watching, as officer's said "what are you going to do write us up too".

64. On 1-6-10, plaintiff's handwritten notes were all read again at the Walker CI. A/P room by  correctional officer's , plaintiff again informed his attorney at court.

65. Later that same evening when plaintiff was returned to the Corrigan Hub, all his legal paperwork was taken by C/O Mararrty, then plaintiff was shoved into a holding cell.

66. Plaintiff's legal papers were taken out of sight to another room as plaintiff adamantly objected and began kicking the cell door.

67. A short time later C/O C.J Yother  and other C/O's    were remarking about documents which were contained in plaintiff's legal folders.

68. C/O Yother, was walking around reading from the plaintiff's notes and arrest warrant, also notes of defense strategies.

69. On plaintiff's third day of trial 1-7-10, while preparing in his cell in the early morning hours, plaintiff became aware that numerous legal documents were missing from the night before, specifically but not limited to statements, police reports, hand written documents and notes he took during trial, and cross-

examination for correctional officers and jailhouse informents.

70. On 1-8-10, plaintiffs attorney addressed the trial court regarding all the fore mentioned issues of plaintiff being subjected to harassment by correctional officials.

71. Plaintiffs attorney went as far as drafting a §1983 civil complaint regarding the same issues, however, it was never filed because the D.O.C. Commissioner placed the plaintiff on special transport so he would not have to go to the Corrigan facility.

C O U N T   F O U R

72. After plaintiffs trial was concluded, plaintiff began researching how to amend his §1983 complaint, plaintiff relied on case law and other self help information sent in to the facility from friends and family, because Walker CI. did not have any legal resources.

73. During the last week of March 2010, plaintiff was working feverishly to amend his complaint using the materials sent in plaintiff had limited knowledge and relied on the self help information that he had sent in and was kept in his cell.

74. On 3-31-10, plaintiff engaged in a heated argument with C/O Coachman regarding being able to put his legal materials away before being forced out of the cell.

75. Plaintiff and other inmates had to leave their cells to allow civilian contractors to replace the lighting fixtures.

76. C/O Coachman entered each cell momentarily inspecting each cell, however, upon entering plaintiffs cell C1-44 he remained

12

inside shaking down for 20 to 30 minutes.

77. Coachman exited the cell with a brown paper commissary bag and walked to the far end of the tier and emptied it's contents into the garbage can.

78. Upon returning to the cell, plaintiff and cell mate, found all of their legal materials tossed upside down and spread all together on the lower bunk and floor area.

79. While separating the mess, Coachman approached the cell door making derogatory remarks and laughing, plaintiff asked where his law suit paperwork was, Coachman stated "I served in the military protecting scum like you" by the way happy anniversary, plaintiff was arrested on his capitol murder on the same day in 2008.

80. Plaintiff replied that the suit had nothing to do with him, Coachman responded there brother officers and then walked away.

81. Plaintiff started to notice more and more missing legal paperwork including Attorney letters , letters the plaintiff had just sent out the day before to the D.O.J. and most of his self help materials and caselaws sent in for his §1983 claim.

82. When plaintiffs cell door opened for lunch he pulled the garbage can into his cell and tried to recover what he could of the documents from the garbage, however, most were wet and contaminated and in poor shape.

83. The period between lunch and noon recreation plaintiff had been trying to copy as much of the wet documents best he could, his amended petition had been totally destroyed by liquid and

had to be recreated by memory over the next few weeks.

84. When plaintiff went to noon recreation in the day room, plaintiff observed C/O Fleming and C/O Perez, enter the unit and proceed directly to plaintiffs cell C1-44, plaintiff knew both officers to work in the intelligence unit.

85. Defendant Fleming and Perez, remained in the plaintiffs cell for 45 minutes reading through all plaintiffs legal material which included but is not limited to the §1983 that plaintiff had been trying to recover, several four inch folders from his capitol felony trial, attorney letters, letters to D.O.J..

86. Then defendant Fleming and Perez, exited the cell with several folders plaintiff knew to contain his legal materials and immediately left the unit, this activity was clearly seen by the units N.I.C.E. vision video surveillance and was also witnessed by other inmates.

87. Plaintiff went directly to the officers station demanding to see the Captain, and was told that he was unavailable, then plaintiff demanded to see the counselor where he was able to make a call to his attorney where he was forced to leave a message, plaintiff also informed counselor that he wanted the video saved, and was told again to write the Warden.

88. On 4-1-10, plaintiff was escorted from his cell by LT. Kavanaugh, to the unit managers office, where C/S Martucci and Captain Salius were waiting, the door was shut and plaintiff was told to sit and shut up, by Kavanaugh.

89. Defendant Martucci, told plaintiff she initiated the searches and was looking for correspondence from Quinnipiac University which entered the facility under the guise of legal mail.

90. Plaintiff stated that everything that he received was case law and legal reference materials that his friend who worked at the University sent to help him with his legal pursuit, and none of it was sent privileged or confidential in any way.

91. Plaintiff asked why all of legal paperwork had been taken, read and not returned, and that he wanted it back.

92. Defendant Martucci, then through several empty envelopes at plaintiff and said she was going to contact plaintiff's friend and let them know who they were dealing with, Matrucci then called the University.

93. Plaintiff asked for the return of his legal paperwork that was taken the day before and the legal materials that were in the now empty envelopes, defendant Salius and another Lieutenant stated "you belong to us now and whether you survive is going to be up to us, now leave the office".

94. Plaintiff left the office and walked into the counselor's office and gave the counselor a phone number the counselor believed to be his attorney's , however, it was the F.B.I..

95. Plaintiff then made a telephonic complaint regarding the incidents that had occured the last two days.

96. Plaintiff also wrote a inmate request to Warden Murphy, to preserve the NICEVISION video from the unit and then

a administrative remedy describing the incidents, this was on
4-5-10. However, video was not preserved violating Due Process.

97. On 4-5-10, plaintiff also filed a motion to preserve the
video with the habeas court where he had an on going case that
involved similar incidents.

98. On 4-5-10, plaintiff wrote a letter to the Federal Judge
overseeing his civil section 1983 civil case, explaining that
the incidents were effecting and impeding his ability to litigate
his claims.

99. Because of the actions and confiscations by the correctional
agents, plaintiff's efforts to amend procedural defects in his
§1983 civil case No.3:09-cv-0009 were frustrated and impeded
to the point defendants were awarded summary judgment regarding
the claim of excessive force that plaintiff was trying to plead.

100. The documents that were taken by C/O Coachman and tossed
in the garbage where they sustained substantial water damage
and were unable to be duplicated from memory, included the only
copy of the amended 1983 civil complaint that plaintiff had
that included the claim of excessive force and the other legal
paperwork plaintiff had previously mentioned at the begining
of this count.

101. The further confiscations and failures to return plaintiff's
additional paperwork by Fleming , Perez , Marticci and salius
caused plaintiff to fail in his pleadings regarding the issue
of excessive force because the self help reference materials
were missing pages when some were recovered from the garbage.

# C O U N T   F I V E

102. While plaintiff was in the H1-Unit at M.W.C.I. the attending counselor overseeing the plaintiff was Sarah Skribiski, this counselor was and is a close and personal friend of defendant Karen Martucci, and several of the correctional officer's named in plaintiff's civil action.

103. Defendant Skribiski, became familiar with the plaintiff's legal proceedings because she was in control of distributing legal mail and providing legal calls to the plaintiff, plaintiff received voluminous incomming legal mail on a daily basis, and was making numerous legal calls arranged through this counselor.

104. During mid month of June 2012, plaintiff sent out by U.S. mail over 300 interrogatories and request for admissions to the correctional defendants, many of whom worked at M.W.C.I. facility where plaintiff was housed.

105. The procedure in the H1-unit for inmate's to send out over-weight legal correspondence is to hand it to the counselor un-sealed so that it could be inspected before it is sent out, at that time that the interrogatories were sent out an argument ensued regarding counselor Skribiski, reading the privileged documents and also because plaintiff was denying this counselor's advances for intimate contact.

106. These denials and attendant arguments enraged the counselor who threatened plaintiff that "she could fuck up everything

regarding plaintiff's civil action against other staff members, and make sure things became very difficult for plaintiff in the unit".

107. After the argument this day, plaintiff was passed over on the unit job list which went according to seniority and the date the inmate is classified, also, because of the denial of timely legal calls, and the failure of this counselor to inform the plaintiff of incoming legal calls from his attorneys, non-responses to inmate requests sent to this counselor and her ignorance to the timely legal needs, such as photo-copies and typing paper. Legal mail was maliciously ripped open and thrown at the plaintiff and on the floor, however, plaintiff believed this behavior to be incidental and temporary do to the plaintiff declining this counselor's intimate advances.

108. On 6-19-12, plaintiff spoke to Deputy Warden Barone, during a routine unit tour and asked to be permanently housed in H1-unit because of a possible profile and problems with other inmates within the institution, also, because plaintiff's cell mate was compatable and respectfull of the large quantity of legal materials plaintiff kept in his cell. A hold was placed.

109. On 6-20-12, plaintiff was called to the counselor's office and threatened he would be given a false disciplinary report and brought to Seg if he went over her head again, plaintiff was able to make the legal call and then went back to his cell.

110. On 6-22-12, plaintiff was provided bags to pack his property

as he was being transfered to J-Unit, however, after plaintiff
brought the hold to a lieutenant the move was canceled pending
further investigation.

111. On 6-25-12, plaintiff was called to the counselor's office
for a telephonic confrence with Magistrate Judge Fitzimmons,
and Attorney Strom, regarding another collateral case. After
the conference was completed the counselor Skribiski, began
acting bazzar and accused plaintiff of contacting the court
regarding her, and threatened plaintiff that she would make
his stay intolerable because she had been contacted by the Warden
office regarding the hold placed upon the plaintiff.

112. On 6-28-12, plaintiff's cell mate was told to pack his
property, that he was being moved to J-Unit, again, plaintiff
spoke to a shift supervisor regarding the prior conversation
with Deputy arden Barone, the move was put on hold until the
next morning again, pending investigation.

113. The following morning plaintiff's cell mate was called
to the officer's station and screamed at by Skribiski, who said
"plaintiff thinks his litigation can make his life better, he
going to learn the hard way, and that the move had nothing to
do with him, however, if he did not move he would be written
up.

114. 7-2-12, plaintiff wrote a letter directly to the Magistrate
Judge Fitzimmons regarding legal issues in his other filed claim,
and noted that he was being retaliated against by correctional
staff at M.W.C.I..

115. On 7-5-12, a new cell mate entered plaintiff's cell, it was determined that he had a bottom bunk pass, however, he went to the top bunk. Plaintiff also had well documented medical issues which prevented him from being on the top bunk.

116. The following morning plaintiff brought his cell issues to the H1-Unit manager, Counselor Supervisor J. Lawrie, explaining he had been housed in the same cell for over 18 months and his new cell mate needed a bottom bunk also, and needed to be moved.

117. Counselor Supervisor Lawrie, stated that he would move the new cell mate to a different cell later that afternoon.

118. Plaintiff's cell mate then was called to the Unit Manager's office where counselor Skribiski, was already sitting. They both told plaintiff's cell mate that they were not going to move him, but, wanted to teach plaintiff a lesson for filing all his law suits and that they wanted plaintiff removed from the H-Unit. Plaintiff's cell mate then came back to the cell and indicated that he would provide a statement as to this conversation and he thought it was wrong what they were doing.

119. On 7-6-12, plaintiff was moved to the lower tier into a cell that faced a wall and others had complained they could not watch TV because no digital signal could be recieved. This was done on friday, second shift, so that plaintiff could not prevent prevent the move without going to seg and receiving a disciplanry report.

120. On 7-9-12, Monday, morning plaintiff confronted Unit mgr. Lawrie, regarding why he was moved to another cell and to another tier where he would not go to recreation with other inmate's he befriended over the last 18 months, and most importantly would not attend library with persons who were helping plaintiff with his litigation. As this conversation was in progress, CC. Skribiski, entered the office and stated "that is where we keep our litigators in the worst cells with the worst cell mates." CS. Lawrie, "the move is final and the next will be out of the unit." Plaintiff was ordered back to his cell.

121. On 7-30-12, plaintiff put in a inmate request to Skribiski, to make a legal call for Wednesday 8/1, plaintiff was never called even though several other inmate's were called who had requested calls just that morning.

122. On 8-1-12, plaintiff wrote an inmate request to Deputy Warden Barone, regarding staff retaliation against the plaintiff soon after some of the correctional defendant's received the interrogatories posed upon them.

123. On 8-2-12, CC Skribiski, entered H1-Unit and entered the rest room in the officer's station, plaintiff obtained permission from C/O McBride, to stay behind from chow and speak to the counselor, when confronted  regarding the legal call, plaintiff was told he was not getting a call, and given a direct order to lock up in his cell, then this counselor screamed verbal obsentities at the plaintiff as he walked away slowly she told plaintiff not to file so many law suits.

124. Shortly after plaintiff locked up, Skribiski approached his cell screaming at plaintiff using insulting language stating" this is what you get when you file law suits here, and to forget about getting your contact visits reinstated, you will never touch your granddaughter" plaintiff was supose to be reinstated to contact visits after 2yrs of non-contact visits.

125. One hour later plaintiff was served a disciplinary report for not locking up in his cell fast enough when he was told earlier by Skribiski.

126. Plaintiff tryed to address these issues with the unit - manager Lawrie, when he toured the unit shortly after plaintiff received the ticket, when Lawrie approached the cell he said "all this is simple just drop the lawsuit and things will get better and go back to normal, you may even get a job".

127. Plaintiff immediately notified staff that he needed to speak to his case worker in mental health unit because he was distraught and extremely stressed out by everything that staff was doing towards him.

128. Plaintiff was called to the mental health Unit, his case worker was not there, after plaintiff began to vent he was placed in segragation pending investigation.

129. Plaintiff was placed in punitive seg on 8-2-12, while the false disciplinary report and allegations of sexual contact between he and the unit counselor were being investigated.

130. On 8-9-12, while plaintiff was being held in RHU Magistrate Judge Fitzsimmons, held a telephonic conference with plaintiff and Atty. Strom, to inform plaintiff that counsel had been appointed to his other 1983 claim.

131. Immediately after plaintiff hung up the phone, the investigator and other staff confronted the plaintiff regarding the call, stating plaintiff did not need to bring this to the court because the false disciplinary report was being droped because of what was reviewed on the unit security video.

132. On the evening of 8-9-12, plaintiff was transfered to the Cheshire correctionall facility,

133. When plaintiff was transferred, he and the CTU driver that was transporting plaintiff informed the A/P officer at M.W.C.I. that plaintiff was missing a box of legal papers, the A/P officer said it will be sent on the next trip.

134. Plaintiff did not receive this box of legal papers until more than two weeks later, only after writing to the CTO at Cheshire CI.

135. Plaintiff had a legal visit with his attorney's on 9-11-12, at that time determined that he was missing crucial paperwork containing Exhibits and a part of his work product containing information he wrote to provide to his attorneys on how to cross-examine defendant's in his up coming federal trial.

EXHAUSTION OF ADMINISTRATIVE REMEDIES

136. Plaintiff has exhausted all administrative remedies with respect to all claims.

137. Plaintiff has sent an inmate remedy form to the Corrigan

facility regarding the incident on 1-6-10, regarding defendant
C.J. Yother and the other C/O's  however, after placing the
remedy form in the remedy box at Walker CI. it was never answered
plaintiff then appealed the non-response and never received
an answer, on 10-17-11, plaintiff wrote to the remedy
 coordinator at M.W.C.I. and was told there is no evidence of
any grievance or receipt from the Corrigan Facility from January
2010. Plaintiff has made photo-copies of all remedies filed.

138. Plaintiff did not mention the threats and coercion by
defendant Salius, because he was in fear for his life and never
put this information forward in any remedy out of fear of
reprisal, however, plaintiff brought these issues forward to
a Federal Judge and a complaint to the F.B.I..

CLAIMS FOR RELIEF

First Count (Defendants Villarini , Patz , and Murphy)
42 U.S.C. §1983 / First , Fifth , Sixth and Fourteenth Amendments
to the United States Constitution.

The allegations contained in paragraphs 12 through 30 of the
preliminary statement are hereby reincorporated and realleged
as paragraphs 1 through 19 of the First Count.

139. The defendant's were recklessly indifferent to the plaintiff's
rights secured and protected by the First, Fifth, Sixth and
Fourteenth Amendments to the United Sates Constitution, in one
or more of the following ways:

 (A) In reading plaintiff's hand written legal notes where
plaintiff had an expectation of legal privacy. The state agents
intruded upon this attorney - client privilege, in that, the

24

notes were intended confidential communications for the purpose
of legal representation and to aid in plaintiff's defense.

(B) In confiscating certain privileged handwritten materials,
defendant's hindered and impeded effective privileged
communications between attorney and client, in that, the notes
were privileged work product intended to be communicated to
plaintiff's attorney to aid in his defense.

(C) In that, the defendant correctional agents acted jointly
and in concert and conspiracy with State Police and other agencies
to intercept privileged attorney - client communications in
exigence to gain defense strategies tactically needed to aid
in fabrication and prosecution of a weak criminal case that
plaintiff had no involvement in.

(D) In that, the officer's and agents acted jointly and in
concert with each other as they had a duty and opportunity to
protect the legal privacy of plaintiff from the unlawful actions
of the others.

140. As a direct and proximate result of the conduct of these
officer's and agents, the plaintiff was denied legal privacy
when the agents read attorney - client communications, confiscated
and lost irreplaceable documents intended for his attorney to
aid in his defense, these actions violated constitutional
protections.

Second Count (Defendant's Villarini, Black, Patz, Murphy, and Bowen)
42 U.S.C. §1983 First, Fifth, Sixth and Fourteenth Amendments
to the United States Constitution)

The allegations contained in paragraphs 31 through 61 of the
preliminary statement are hereby reincorporated and realleged
as if fully restated herein as paragraphs 1 through 31 of the
second count.

141. The defendants were recklessly indifferent to the plaintiff's
rights secured and protected by the First, Fifth, Sixth and
Fourteenth Amendments to the United Sates Constitution, in one
or more of the following ways:

(A) In reading the plaintiff's handwritten legal notes where
plaintiff had and expectation of legal privacy. The state agents
intruded upon an expectation of legal privacy. The state agents
intruded into the attorney - client privilege, in that, the
notes were intended communications for the purpose of legal
representation and to aid in plaintiff's defense.

(B) In confiscating certain privileged handwritten materials,
credit card statements and consumer purchase receipts, defendants
hindered and impeded effective privileged communications between
attorney - client, in that, the legal documents were privileged
work product intended to be given to plaintiff's attorney to
aid in his defense.

(C) In that, the correctional agents were working in concert
with CSP detectives, to intercept confidential attorney - client
privileged communications and learn defense strategies and
tactics to help aid in fabrication and prosecution of a weak
criminal case that plaintiff had no involvement in.

(D) In that, defendant CTU driver Bowen, conspired and aided in dissemination of said confiscated attorney - client privileged documents to a state police detective investigating plaintiff's criminal case.

(E) In that, LT. Black failed to properly investigate and/or take action to further prevent the attorney - client privileged documents from being disseminated and/or log the constitutional complaints and/or further investigate Villarini, for the repeated acts of confiscation and reading privileged legal documents.

(F) In that, Captain Patz, failed to properly act upon the plaintiff's complaints of the said constitutional violations and/or take take any further actions to investigate and/or prevent future violations of said constitutional nature.

(G) In that, Warden Murphy, failed to engage or properly act in a timely investigation into constitutional complaints to prevent on-going deprivations of plaintiff's constitutional rights, further failed to preserve the NICEVISION video needed for litigation also, failed to take disciplinary or other action of subordinate officers to curb the known pattern of complaints of reading and confiscating privileged legal materials.

142. As a direct and proximate result of these officers and agents, the plaintiff was denied legal privacy when the agents read and confiscated privileged communications and materials, plaintiff was denied Due Process when the video was not preserved and was further denied protections guaranteed by the United States Constitution because of the non-actions by Warden Murphy and / or his agents who had a duty to protect plaintiff detainee.

Third Count (Defendant's Mararrty, and Yother) 42 U.S.C. §1983
First , Fifth, Sixth and Fourteenth Amendments to the United
Sates Constitution)

The allegations contained in paragraphs 62 through 71 of the
preliminary statement are hereby reincorporated and realleged
as if fully restated herein as paragraphs 1-11 of the third count.

143. The defendant's were recklessly indifferent to the
plaintiff's rights secured and protected by the First, Fifth,
Sixth and Fourteenth Amendments to the United States Constitution
in one or more of the following ways:

    (A) In reading the plaintiff's handwritten legal notes where
plaintiff had an expectation of privacy, the state agents
intruded upon the attorney - client privileged communications
which were for the purpose of legal advise and representation
to aid in his defense during an on-going criminal trial.

    (B) In confiscating and failing to return confidential
attorney - client communications plaintiff intended to keep
private and share with his attorney, in that, agents hindered
privileged communications between attorney and client during
and on-going criminal trial.

144. As a direct and proximate result of these officer's and
agents the plaintiff was denied legal privacy, the right to
consult with his attorney effectively and privacy in his
communications and his right to un-hindered representation which
is guaranteed by the First, Fifth, Sixth and Fourteenth Amendment
to the United States Constitution.

Fourth Count (Defendant's Coachman, Perez, Fleming, Salius, Martucci and Murphy 42 U.S.C. §1983 First, Fifth and Fourteenth Amendments to the United States Constitution)

The allegations contained in paragraphs 72 through 101 of the preliminary statement are hereby reincorporated and realleged as if fully restated herein as paragraphs 1 through 30 of the Fourth Count.

145. The defendants were recklessly indifferent to the plaintiff's rights secured and protected by the First, Fifth and Fourteenth Amendments to the United States Constitution, in one or more of the following ways:

(A) In reading the plaintiff's legal materials, where he had an expectation of legal privacy. The state agents intruded upon legal work product intended for on-going litigation in a 1983 civil action, in that, the legal work product was privileged and intended to be private and confidential.

(B) In confiscating and failing to return certain privileged confidential legal materials needed for pending litigation in a 1983 civil action, In that, agents took privileged documents, which hindered plaintiff's ability to effectively litigate.

(C) In that, defendant Martucci, used the guise of a safety and security investigation to intrude upon the legal privacy of the plaintiff, these actions were in concert with other state agents to gain tactical information for a criminal investigation and for the intended purpose of retaliation.

(D) In that, defendant Coachman, maliciously destroyed legal documents by throwing them in the trash, read and tossed about legal documents in the cell in an attempt to deter plaintiff from filing his civil action. In that, Coachman retaliated against the plaintiff for engaging in protected conduct.

(E) In That, defendant Salius, had a duty to look into the investigation performed by Martucci, which he would have found it served no security goal, the out-going contraband of plaintiff cellmate had no nexus to plaintiff's incoming corrospondence as all incoming legal mail is opened in front of a counselor.

(F) In that, all officer's and agents acted jointly and in concert with each other as they had a duty and opportunity to protect the legal privacy of the plaintiff, from the unlawful actions of the others and also to deter known retaliation.

(G) In that, Warden Murphy, failed to properly investigate the plaintiff's inmate remedies and complaints and further failed to preserve the NICEVISION video that recorded these events, he also failed to take action to curb the reading, confiscations and retaliation by subordinate officer's which was on-going and violated the plaintiff's rights.

146. As a direct and proximate result of the conduct of these officer's and agents the plaintiff was denied constitutional protections secured and protected by the United Sates Constitution when agents used the guise of safety and security investigation to invade legal privacy in an attempt to gain tactical information of defense strategies in pending litigation.

Fifth Count (Defendant's Skribiski and Lawrie) 42 U.S.C. §1983
First, Fifth and Fourteenth Amendments to the United States
Constitution.

The allegations contained in paragraphs 102 through 135 of the
preliminary statement are hereby reincorporated and restated
herein as paragraphs 1 through 34 of the Fifth Count.

147. The defendant's were recklessly indifferent to the
plaintiff's rights secured and protected by the First Amendment
to the United States Constitution, in one or more of the
following ways:

   (A) In that, defendant Skribiski, brought false disciplinary
charges , interfered with a federal civil action, and retaliated
against plaintiff for engaging in constitutionally protected
civil rights proceeding initiated to protect plaintiff's civil
rights, moved plaintiff's cell assignment to dehumanize and
impose a more intolerable environment, in an attempt to force
plaintiff out of the H1-unit, and deter him from filing his
civil action.

   (B) In that, the actions and / or failures to act by unit
manager J. Lawrie, constituted reckless indifference in his
failure to supervise a subordinate counselor, and to take action
to prevent the known retaliation, further he actively participated
inretaliatory acts in attempt to deter plaintiff from exersizing
his First Amendment rights, also failed to properly investigate
the false disciplinary report he signed off on 8-2-12, that
was written by Skribiski, for retaliatory purposes.

148. As a direct and proximate result of the retaliation of
these agent's plaintiff was subjected to being placed in a
less desirable cell assignment , was denied and passed over
on the unit job assignment list , was issued a false disciplinary
report, subjected to RHU confinement for several days , then
transfered to a less desirable Correctional facility, where
during the transfer crucial legal documents needed for pending
litigation were confiscated or lost, all because plaintiff filed
a civil rights action against officer's and agents at this
institution.

## R E L I E F   R E Q U E S T E D

**Wherefore,** plaintiff requests the court grant the following
relief:

A. ISSUE A DECLARATORY JUDGMENT STATING THAT:

1. The reading, confiscations and interference of the
attorney - client privilege and legal privacy of legal
items  associated with pending litigation by defendant's
Villarini, Perez, Fleming, Yother, Mararrty, Coachman, and
Martucci were recklessly indifferent to plaintiff's First,
Fifth, Sixth, and Fourteenth Amendments to the United
States Constitution.

2. The failures to properly investigate and take action to
curb the on-going complaints of reading, confiscations,
interference and frustration by Patz, Salius, Martucci, Black,
and Lawrie, were recklessly indifferent to plaintiff's First,
Fifth, Sixth and Fourteenth Amendment right secured and
protected by the United States Constitution.

B. AWARD PUNITIVE DAMAGES IN THE FOLLOWING AMOUNTS:

1. $25,000,00 each jointly and severely against defendant's
Villarini , Yother , Marrarty , Fleming and Perez, and Bowen.

2. $75,000.00 each jointly and severely against Salius,
Black , Martucci , Patz , Skribiski and Lawrie.

3. $100,000.00 jointly and severely against Murphy.

C. Grant such other relief as it may appear that plaintiff may
be entitled to.

D. Award attorney fees and costs.

January 3, 2013

Respectfully Submitted,

The Plaintiff,

George M. Leniart #250010
Cheshire Correctional
900 Highland Ave.
Cheshire CT. 06410

V E R I F I D   C O M P L A I N T

The plaintiff, George M. Leniart #250010, hereby declares
under the penalty of perjury that all the facts in the above
complaint are true and correct to the best of plaintiff's belief.
PURSUANT TO 28 U.S.C. §1746

George M. Leniart #250010

## C E R T I F I C A T I O N

    I hereby certify that a copy of the following has been mailed this 3rd day of January 2013, to the following:

AAG Steven R. Strom
110 Sherman ST.
Hartford CT. 06105

George M. Leniart #250010
Cheshire CI.
900 Highland Ave.
Cheshire CT. 06410